**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| **Annette H. Ardis,** | ) | **Civil Action No.:** 3:26-cv-849-SAL |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **COMPLAINT** |
| | ) | |
| **Attain Finance, f/k/a CURO Group** | ) | **JURY TRIAL DEMANDED** |
| **Holdings Corp., CURO Group** | ) | |
| **Holdings LLC, CURO Management,** | ) | |
| **LLC; Heights Finance Holding Co.;** | ) | |
| **Quick Credit Corporation; and** | ) | |
| **National Credit Adjusters, L.L.C.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## COMPLAINT

1.     This is an action brought by Plaintiff, Annette H. Ardis, for actual, statutory and punitive damages, attorneys' fees, and costs for Defendants' violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* (hereinafter "FCRA"), and for actual and statutory damages, and attorney fees for Defendant National Credit Adjusters, L.L.C.'s violations of the Fair Debt Collection Practices Act, 15 U.S.C. §1692, *et seq*. (hereinafter "FDCPA"). The Plaintiff also seeks compensatory and punitive damages for Defendants' violations of South Carolina common law as set forth herein.

2.     The FCRA exists to protect consumers' privacy and to impose upon those who trade in consumers' private information strict requirements to ensure that the information they report is as accurate as possible.

3.     Before the enactment of the FCRA, inaccurate and misleading information was

1

identified as "the most serious problem in the credit reporting industry." 115 Cong. Rec. 2411 (Jan. 31, 1969). With this problem in mind, Congress enacted the FCRA "to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report." S. Rep. No. 91-517 (1969).

4.      To accomplish Congress' goals, the FCRA contains a variety of requirements to protect consumers, including §§ 1681e and 1681s-2(b), which are two of the cornerstone provisions of the FCRA.

5.      One of the primary purposes of the FCRA is to assure "maximum possible accuracy" of consumer information to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

6.      The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed* (emphasis added).

2

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)].

## JURISDICTION AND VENUE

7.     This Court has Jurisdiction under 15 U.S.C. §1681p, 15 U.S.C. §1692k(d), and 28 U.S.C. §1331 and §1367.

8.     Venue is proper in the Columbia Division because the Plaintiff resides in Lee County, and the Defendants transacted business here.

## PARTIES

9.     Plaintiff, Annette H. Ardis, is a resident and citizen of the State of South Carolina, Lee County, and is over the age of twenty-one (21) years.  Plaintiff is a consumer as that term is defined by the FCRA, 15 U.S.C. §1681a(c).

10.     Defendant Attain Finance, f/k/a CURO Group Holdings Corp., CURO Group Holdings LLC, and CURO Management, LLC, ("Attain"), is a consumer credit lender headquartered at 3527 North Ridge Road, Wichita, Kansas 67205. Defendant Attain may be served with process through its Chief Executive Officer, Doug Clark, at 3527 North Ridge Road, Wichita, Kansas 67205. Defendant Attain operates under a number of different brands including, Heights Finance and Quick Credit.

11.     At all times relevant hereto, Defendant Attain exercised complete control over each of its brands named herein.

12.     Defendant Attain is responsible for all reporting of accounts to the credit reporting agencies, including managing and overseeing the handling of all disputes received through the credit reporting agencies.

3

13.     Defendant Heights Finance Holding Co. ("Heights"), is a financial services company headquartered at 301 N. Main Street., 23rd Floor, Greenville, South Carolina 29601.  Defendant Heights is a wholly owned subsidiary of Defendant Attain.   Defendant Heights does business throughout the United States, including in South Carolina, under several brand names, including Quick Credit, Heights Finance, Covington Credit, and Southern Finance.  At all times relevant hereto, Defendant Heights exercised complete control over all of the subsidiaries identified below and directed all of their activities, including their lending operations. Heights may be served with process through its registered agent for service of process, Corporation Service Company, 100 Coastal Drive Suite 210, Charleston, South Carolina 29492. At all times and in all respects relevant herein, Defendant Heights was doing business in the state of South Carolina and in this division.

14.     Defendant Quick Credit Corporation ("Quick Credit") is a South Carolina corporation and a wholly owned subsidiary of Heights.  Quick Credit is one of Heights's principal licenses holders in South Carolina, allowing its storefronts, namely its "Quick Credit" storefronts, to conduct lending operations within the state.  Because Quick Credit Corp. is a wholly owned subsidiary of Heights and performs all of its activities and lending operations at Heights's direction, it shares a primary business location at 301 N. Main Street, 23rd Floor, Greenville, South Carolina 29601. Quick Credit may be served with process through its registered agent for service of process, Corporation Service Company, 100 Coastal Drive Suite 210, Charleston, South Carolina 29492. At all times and in all respects relevant herein, Defendant Quick Credit was doing business in the state of South Carolina and in this division.

4

15.    Defendant National Credit Adjusters, L.L.C. ("NCA") is a Kansas corporation that may be served with process through its registered agent for service of process, Corporation Service Company, 100 Coastal Drive Suite 210, Charleston, South Carolina 29492. Defendant NCA is a "debt collector" as that term is defined in 15 U.S.C. 1692a(6) and is regularly engaged in the collection of debts. At all times and in all respects relevant herein, Defendant NCA was doing business in the state of South Carolina and in this division.

16.    Defendants each acted in concert together with the others, participated in, and contributed to the damages caused to the Plaintiff.

17.    All acts done by Defendants were done on their own behalf and on the behalf of the other Defendants.

## FACTUAL ALLEGATIONS

18.    In 2019, Plaintiff first became the victim of identity theft and had accounts opened in her name without her knowledge or permission.

19.    In 2020, Plaintiff filed a police report, filed an identity theft affidavit with the Federal Trade Commission, and placed a fraud alert on all of her credit reports.

20.    On or about March 30, 2020, Experian sent Plaintiff a postcard confirming a fraud alert had been placed on her Experian credit reports.

21.    On or about March 30, 2020, TransUnion sent Plaintiff a postcard confirming a fraud alert had been placed on her TransUnion credit reports.

22.    On or about March 31, 2020, Equifax sent Plaintiff a letter confirming the fraud alert had been placed on her Equifax credit reports.

23.    In 2024, Plaintiff began receiving debt collection letters in the mail for credit card

accounts that did not belong to her. This was extremely frightening and stressful to Plaintiff because she does not have or use credit cards. In fact, Plaintiff is and always has been adamant about only using cash or checks as forms of payment.

24.     In February 2025, worried that she was again the victim of identity theft, Plaintiff tried to obtain copies of her credit reports online. Unfortunately, when Plaintiff tried to obtain a copy of her Equifax credit report, she was denied access. When Plaintiff tried to obtain a copy of her TransUnion credit report, she could not answer the identity verification questions because the questions contained information known only to the identity thief.

25.     Subsequently, Plaintiff learned that the identity thief was living at 427 New Castle Road, Greenville, South Carolina. Plaintiff also learned the thief paid her electricity bill with one of the fraudulent credit cards opened in Plaintiff's name.

26.     On or about February 7, 2025, Plaintiff called the credit reporting agencies to request copies of her credit reports.

27.      On February 7, 2025, Plaintiff filed a police report with the Lee County Sheriff's Office.

28.     On February 7, 2025, Plaintiff also filed an Identity Theft Report with the Federal Trade Commission wherein Plaintiff provided the address used by the identity thief to open the fraudulent accounts. Plaintiff also provided the police officer's name and report number for Plaintiff's police report.

29.     On or about February 12, 2025, Equifax sent Plaintiff a letter with a verification code she could use to complete the enrollment process for myEquifax so she would be able to obtain a copy of her credit report.

30.     On or about February 25, 2025, Plaintiff finally received a copy of her Equifax credit report in the mail and learned that it was full of inaccurate information.  Specifically, Quick Credit, Acct. No. *2649, was reporting a charged-off installment loan as opened in January 2020, delinquent on February 1, 2020, and Transfer/Sold.   Plaintiff never opened an account with Quick Credit, nor did she ever apply for, nor receive a loan from Quick Credit. NCA, Acct *2649, was  reporting a collection account opened in October 2022 with a past due balance of $1,179.  (Both accounts are hereinafter referred to as the "Accounts").

31.     On or about February 25, 2025, Plaintiff received a copy of her Experian credit report. Upon review of her credit report, Plaintiff learned she had a FICO score of 565, which was labeled as poor.  She also discovered that numerous fraudulent accounts were reporting on her credit, as well as an address where she had never lived, three variations of her social security number, and two phone numbers, none of which belonged to Plaintiff. Specifically, Plaintiff discovered both Accounts were reporting as derogatory accounts belonging to Plaintiff on her Experian credit report.

32.     On or about February 25, 2025, TransUnion sent Plaintiff a letter stating it was unable to locate a credit report for Plaintiff based on the information she provided.  Plaintiff was asked to provide copies of two documents to verify her current address, Social Security number, and date of birth.

33.     Plaintiff immediately forwarded TransUnion a copy of her driver's license and her Social Security benefits statement.

34.     On or about March 16, 2025, Equifax sent Plaintiff a letter stating an initial fraud alert had been added to Plaintiff's Equifax credit file.

35.    On or about March 16, 2025, TransUnion sent Plaintiff a second letter requesting proof of her current mailing address.

36.    On or about March 24, 2025, Plaintiff sent a dispute letter to Equifax ("First Equifax Dispute") stating she had been the victim of identity theft and fraud, and requested that Equifax remove the fraudulent NCA and Quick Credit Accounts from appearing on her credit report, as they were fraudulently opened in her name.  With her dispute, Plaintiff included her address, full Social Security number, and date of birth. Equifax received Plaintiff's dispute on March 28, 2025.

37.    On or about March 24, 2025, Plaintiff sent a dispute letter to Experian ("First Experian Dispute") stating she had been the victim of identity theft and fraud.  Plaintiff requested Experian remove all of the items appearing on her credit report that did not belong to her.  Specifically, Plaintiff listed the NCA and Quick Credit Accounts as fraudulently opened in her name without her knowledge or permission.  Plaintiff provided her address, full social security number, and date of birth in her letter, and requested Experian add a fraud alert to her credit file.  Upon receipt of Plaintiff's dispute, Experian forwarded same to Defendants.

38.    On or about March 24, 2025, Plaintiff mailed TransUnion a completed Alert Request Form along with a copy of her driver's license and Verizon telephone bill.

39.    On or about March 29, 2025, TransUnion sent Plaintiff a postcard informing her a fraud alert had been added to her TransUnion credit report.

40.    On March 29, 2025, Equifax sent Defendant NCA an Automated Consumer Dispute Verification (hereinafter "ACDV") informing Defendant NCA that Plaintiff disputed the

NCA Account as "True Identity Fraud," "Account Fraudulently Opened."  Equifax also informed Defendant NCA that Plaintiff disputed the address of 427 New Castle Rd, Greenwood, South Carolina as a fraudulent address.  On April 16, 2025, Defendant NCA, by and through its employee Jenice Besley, responded to Equifax's ACDV by verifying the reporting of the NCA Account as accurate.  Defendant NCA did not report a compliance condition code noting the Account was in dispute.

41.     On March 29, 2025, Equifax sent Defendant Attain an ACDV informing Defendant Attain that Plaintiff disputed the Quick Credit Account as "True Identity Fraud," "Account Fraudulently Opened."  Equifax also informed Defendant Attain that Plaintiff disputed the address of 427 New Castle Rd, Greenwood, South Carolina.  On April 10, 2025, Defendant Attain, by and through its employee Amber Hoey, verified the reporting of the Quick Credit Account as accurate and updated information unrelated to the dispute.  In response to the ACDV, Defendant Attain continued to report the disputed address as belonging to Plaintiff, as well as an incorrect social security number.  Defendant Attain did not report a compliance condition code noting the Quick Credit Account was in dispute.

42.     On or about March 30, 2025, Equifax sent Plaintiff a letter stating it was unable to locate a credit file in its database with the identification information Plaintiff provided. Equifax requested Plaintiff send them two different items – one to verify Plaintiff's identity and the other to verify her current address.  Thereafter, Plaintiff mailed Equifax another copy of her driver's license.

43.     On April 2, 2025, TransUnion received Plaintiff's Alert Request Form and proof of identity and address, but never provided Plaintiff with a copy of her TransUnion credit

report.

44.     On April 7, 2025, Experian sent Defendant Attain an ACDV on the Quick Credit Account informing it that Plaintiff disputed the Quick Credit Account as true identity fraud/account fraudulently opened.  On April 10, 2025, by and through its employee Amber Hoey, Defendant Attain verified the disputed Quick Credit Account as accurate.

45.     On or about April 17, 2025, Equifax sent Plaintiff a letter including a copy of "Remedying the Effects of Identity Theft" prepared by the CFPB.

46.     On or about May 22, 2025, Defendant Heights sent a letter to Plaintiff stating it had received Plaintiff's notification of identity theft.  As a result, Defendant Heights stated the Quick Credit Account had been placed in "Disputed" status with the credit bureaus. Defendant Heights informed Plaintiff she must provide them with a fully executed Truist Bank Affidavit of Fraud, an Identity Theft Victim's Complaint and Affidavit, a copy of her driver's license, and a police report within 30 days or the Disputed status might be removed from the Quick Credit Account and Plaintiff's fraud claim denied.   The Truist Bank Affidavit of Fraud form provided by Defendant Heights referenced Check No. 3143044015 in the amount of $604.15, made payable to Annette Ardis, and asked Plaintiff to swear that she had carefully examined the check.  Defendant Heights failed to include the referenced check with the Affidavit of Fraud form.

47.     Contrary to Defendant Heights' May 22, 2025, letter, Defendants Attain and Heights did not inform the credit reporting agencies the Quick Credit Account was disputed.

48.     On or about May 25, 2025, Experian sent Plaintiff a postcard-confirming an initial security alert had been added to her Experian credit file.

10

49.     On or about May 25, 2025, Experian also forwarded its Dispute Results to Plaintiff stating its reinvestigation of Plaintiff's disputes was now complete. Experian informed Plaintiff that since it had forwarded the February 25, 2025, credit report to Plaintiff, Experian had discovered an inaccuracy.  Accordingly, Experian stated it was providing Plaintiff with a new credit report with the inaccuracy corrected. However, Experian did not disclose to Plaintiff what information was corrected.  Upon review of the Investigation Results/credit report, the NCA Account continued to be reported as a collection account belonging to Plaintiff with a past due balance of $1,179 as of May 2025.  The Quick Credit Account continued to be reported as a charged-off account with $1,100 written off and sold to NCA, belonging to Plaintiff.  The Quick Credit Account was not reporting as disputed. As a result of Defendants' verifications of the Accounts, both Accounts remained on Plaintiff's credit report as derogatory accounts belonging to Plaintiff.

50.     On or about June 13, 2025, in response to Defendant Heights' May 22, 2025, letter, Plaintiff sent a letter to Defendant Heights.  In her letter, Plaintiff informed Defendant Heights that she did not sign the Truist Bank Affidavit of Fraud included with Defendant Heights' letter because the fraud form asked her to swear that she had carefully reviewed the check referenced in the fraud form.  A check was not provided by Defendant Heights for Plaintiff to examine; therefore, she did not sign the Affidavit of Fraud.  Plaintiff did provide Defendant Heights a copy of the police report she had filed, an FTC Identity Theft Victim's Complaint and Affidavit, a copy of her driver's license, and a copy of her Verizon bill as proof of address.  Plaintiff requested Defendant Heights send her a copy of the check. Defendant Heights received Plaintiff's letter and supporting documents on June 16, 2025.

51.     On or about June 13, 2025, Plaintiff sent a second dispute letter to Equifax ("Second Equifax Dispute") wherein Plaintiff again informed Equifax she had been the victim of identity theft and fraud, and requested Equifax remove the fraudulent NCA and Quick Credit Accounts from her credit report.  Plaintiff provided Equifax with another copy of her driver's license and a copy of her 2022 Social Security Benefit statement showing her social security number. Plaintiff's address, date of birth and full social security number were also provided in her letter. Equifax received Plaintiff's second dispute on June 18, 2025.

52.     On or about June 13, 2025, Plaintiff sent a second dispute letter to Experian ("Second Experian Dispute") stating she had received the results of Experian's reinvestigation into her disputes, but the fraudulent Accounts and incorrect information continued to be reported on her credit report.  Plaintiff again told Experian she had been the victim of identity theft and fraud. Plaintiff specifically disputed the NCA and Quick Credit Accounts as fraudulent accounts opened by the identity thief.  Finally, Plaintiff provided Experian with a copy of the police report she had filed regarding the theft of her identity.   Plaintiff's address, date of birth and full social security number were also provided in her letter.  Experian received Plaintiff's second dispute and police report on June 18, 2025.

53.     Frustrated that TransUnion continued to refuse to provide her with a copy of her TransUnion credit report, on or about June 13, 2025, Plaintiff sent a dispute letter to TransUnion ("First TransUnion Dispute").  In this letter, Plaintiff specifically informed TransUnion that she had never received a copy of her TransUnion credit report even after

mailing TransUnion proof of her identity.  Plaintiff informed TransUnion she had been the victim of identity theft and fraud, and requested TransUnion remove the fraudulent NCA and Quick Credit Accounts from her credit report.  Plaintiff provided TransUnion her address, Social Security number, date of birth, and a copy of her driver's license. Additionally, Plaintiff requested TransUnion send her a complete copy of her credit report. TransUnion received Plaintiff's dispute on June 18, 2025, and thereafter forwarded ACDVs of Plaintiff's disputes to Defendants.

54.     On or about June 18, 2025, TransUnion sent a letter to Plaintiff regarding Remedying the Effects of Identity Theft and setting out some of her rights under the Fair Credit Report Act.

55.     On June 20, 205, Equifax sent Defendant NCA another ACDV informing Defendant NCA that Plaintiff disputed the NCA Account as "True Identity Fraud," "Account Fraudulently Opened."  On June 30, 2025, Defendant NCA, by and through its employee Lishann Blackwood, verified the fraudulent NCA Account as accurate and as belonging to Plaintiff.

56.     On June 20, 2025, Equifax sent Defendant Attain an ACDV informing Defendant Attain that Plaintiff disputed the Quick Credit Account as "True Identity Fraud," "Account Fraudulently Opened."  On July 1, 2025, Defendant Attain, by and through its employee Amber Hoey, responded to Equifax's ACDV by verifying the fraudulent Quick Credit Account belonged to Plaintiff.  Defendant Attain did not report a compliance condition code noting the Quick Credit Account was disputed.

57.     On June 25, 2025, Experian sent Defendant Attain an ACDV informing it that

13

Plaintiff disputed the Quick Credit Account as true identity fraud/account fraudulently opened.  On July 1, 2025, by and through its employee Amber Hoey, Defendant Attain verified the disputed Quick Credit Account as accurate.

58.     At the time of Defendant Attain's responses to Experian and Equifax, Defendant Attain had a different address and different social security number than Plaintiff's information.  Despite these inconsistencies, Defendant Attain continued to verify the fraudulent Quick Credit Account as belonging to Plaintiff.  Additionally, Defendant Attain did not add a compliance condition code noting the Quick Credit Account was disputed.

59.     On or about July 2, 2025, Defendant NCA sent a letter to Plaintiff acknowledging her fraud claim.  Defendant NCA informed Plaintiff that in order for them to properly conduct their investigation and close the Account as fraudulent, they must receive either a police report, an FTC Identity Theft Report, or a fraud affidavit form.

60.     On or about July 7, 2025, Defendant Heights sent a "Notification Letter" to Plaintiff. In this letter, Defendant Heights acknowledged receiving the documentation Plaintiff previously sent them, but stated that it required the Truist Bank Affidavit of Fraud in order to further investigate Plaintiff's fraud claim.  Defendant Heights included another Affidavit of Fraud form referencing Check No. 3143044015 in the amount of $604.15, made payable to Annette Ardis.  However, Defendant Heights intentionally failed to include a copy of the alleged check for Plaintiff to examine.

61.     On or about July 9, 2025, TransUnion sent Plaintiff its Investigation Results wherein TransUnion informed Plaintiff that the NCA and Quick Credit Accounts were deleted from Plaintiff's credit report.

14

62.    On or about July 11, 2025, Equifax forwarded its Reinvestigation Results to Plaintiff. In these Results, Equifax informed Plaintiff that the disputed Quick Credit Account was verified as accurate and information unrelated to Plaintiff's dispute was updated. Accordingly, the Quick Credit Account continued to be reported as belonging to Plaintiff on her Equifax credit report.  The NCA Account was deleted from Plaintiff's credit file.

63.    On July 11, 2025, Equifax sent Defendant Attain an ACDV informing Defendant Attain that Plaintiff disputed the Account as "True Identity Fraud," "Account Fraudulently Opened."  On July 24, 2025, Defendant Attain, by and through its employee Viridiana Sustaita, responded to Equifax's ACDV by again verifying the fraudulent Quick Credit Account belonged to Plaintiff.  Defendant Attain did not report a compliance condition code noting the Quick Credit Account was in dispute.

64.    On or about July 13, 2025, Experian forwarded its Dispute Results to Plaintiff.  In these results, Experian informed Plaintiff that the Quick Credit Account was again verified as accurate and information unrelated to Plaintiff's dispute was updated.  As a result, the Quick Credit Account continued to be reported as belonging to Plaintiff. The NCA Account was finally deleted from Plaintiff's Experian credit report.

65.    On or about July 31, 2025, Plaintiff sent another letter to Defendant Heights stating she had received its July 7, 2025, letter asking her to sign the Truist Bank Affidavit of Fraud.  However, as Defendant Heights again failed to include a copy of the check, Plaintiff informed Defendant Heights that she could not sign the affidavit regarding a check she had never seen.  Plaintiff again asked Defendant Heights to forward her a copy of the check so that she could examine it.

66.     On or about July 31, 2025, Plaintiff sent a letter to Defendant NCA in response to its July 2, 2025. In her letter, Plaintiff enclosed a copy of the police report she filed and a copy of her Identity Theft Affidavit. Plaintiff's letter provided Defendant NCA with her full social security number, address, and date of birth. Defendant NCA received Plaintiff's letter on or about August 6, 2025.

67.     On or about July 31, 2025, Plaintiff sent a third dispute letter to Equifax ("Third Dispute Letter"). In this letter, Plaintiff again disputed the Quick Credit Account as a fraudulent Account and requested Equifax delete the Account from her credit report. Plaintiff also included a copy of the police report she filed regarding the theft of her identity with her letter. Equifax received Plaintiff's third dispute on August 5, 2025.

68.     On or about July 31, 2025, Plaintiff sent a third dispute letter to Experian ("Third Dispute Letter) stating she had received Experian's investigation results, but the fraudulent Quick Credit Account was still reporting on her credit report. Plaintiff asked Experian to remove the fraudulent Quick Credit Account immediately. With her dispute, Plaintiff provided another copy of her police report. Experian received Plaintiff's third dispute and police report on August 5, 2025.

69.     On or about August 4, 2025, Defendant Heights sent a Notification Letter to Plaintiff. In this letter, Defendant Heights acknowledged receipt of Plaintiff's letter requesting a copy of the Check No. 3143044015, in the amount of $604.15 made payable to Annette Ardis. Defendant Heights stated it had made an error in the check amount, and that the correct amount should have been $725.00. Defendant Heights also stated a copy of the requested check was enclosed, as well as an updated Affidavit of Fraud from Truist Bank.

Contrary to Defendant Heights' statement, nothing was enclosed with the letter.

70.    On or about August 6, 2025, Experian forwarded a letter to Plaintiff, wherein Experian stated it had received Plaintiff's dispute, but did not believe it actually came from Plaintiff.  As a result, Experian refused to take any action on Plaintiff's disputes.  Plaintiff was instructed that, if inaccurate information was on her credit report, she should call Experian at 833-421-3400.

71.    On or about August 11, 2025, Equifax sent Plaintiff two separate letters each stating that since Plaintiff had already disputed the Quick Credit Account twice within the last 90 days, Equifax considered Plaintiff's dispute frivolous and refused to investigate.

72.    That same day, Equifax sent Plaintiff a third letter stating it had received Plaintiff's police report and request to block certain information from her credit file, but Equifax refused to block the information.  Equifax informed Plaintiff that for it to block information under the FCRA, Plaintiff had to provide proof of her identity, the specific information that was the result of identity theft, and a copy of a police report.  Although Plaintiff had already provided all of that information to Equifax, Equifax still refused to block the fraudulent Quick Credit Account from Plaintiff's credit report.

73.    On or about September 9, 2025, Plaintiff sent another letter to Defendant Heights wherein she stated she had received its August 4, 2025, letter, but that once again it had failed to include a copy of the check and affidavit.  Plaintiff requested Defendant Heights send her a copy of the check immediately.  Defendant Heights received Plaintiff's letter on September 11, 2025, but never responded.

74.    To the best of Plaintiff's knowledge, Defendant NCA continues to report the

derogatory NCA Account as a collection account belonging to Plaintiff on at least one of her credit reports.

75.    To the best of Plaintiff's knowledge, Defendants Attain, Heights, and Quick Credit continue to report the derogatory Quick Credit Account as belonging to Plaintiff to the credit reporting agencies as well as to third parties.

76.    To date, Defendants Attain, Heights, and Quick Credit have intentionally refused to provide Plaintiff with a copy of the alleged check used to open the fraudulent Quick Credit Account.

77.    From at least February 2020 through the present, Defendants Attain, Heights, and Quick Credit have been reporting the fraudulent Quick Credit Account as belonging to Plaintiff to the credit reporting agencies.

78.    Since at least October 2022, Defendant NCA has been reporting the fraudulent NCA Account as belonging to Plaintiff to the credit reporting agencies.

79.    During the two years prior to the filing of this lawsuit while Defendants were reporting false, inaccurate information to Plaintiff's credit reports and verifying said information as accurate, the Plaintiff's credit reports have been viewed by FebDestiny, Capital One, Credit Fresh Marketing, TBOM/Aspire, T-Mobile, Cap One Auto, The Hartford, Synovus/Verv-FirstDigital, Merrick Bank, OneMain Financial, Tab BankNetCredit, QuinStreet, AXCSSFN/CNGO, CBW/Credit Fresh, Clarity Services, Inc., Clarity/Advance Financia, Clarity/CBW/Credit Fresh, Clarity/CNU Online Holdi, Clarity/Finwise-OppLoans, Conn Appliances, Inc., Montgomery Ward/DM Serc, Resurgent Capital Servic, Seventh Avenue/Dm Servi, Unknown, MDG USA Inc,

Leadsmarket.com LLC, Summit Management Company, LLC, Finance, Verizon, ConsumerInfo.com.

80.    Defendants' knowing and repeated violations of the FCRA warrants an award of punitive damages. *See, e.g., Younger v. Experian Info. Sols. Inc.,* Case No. 2:15-cv-0952-SGC, at *30 (N.D. Ala. Mar. 21, 2019) (awarding punitive damages for repeated, willful violations of the FCRA).

## COUNT ONE
### (Fair Credit Reporting Act)

81.    The Plaintiff adopts the averments and allegations of paragraphs 18 through 80 hereinbefore as if fully set forth herein.

82.    Defendants negligently violated 15 U.S.C. §1681s-2(b)(1)(A) by failing to conduct an investigation after receiving notice that the Plaintiff disputed the Account information said Defendants had provided to a consumer reporting agency.

83.    Defendants negligently violated 15 U.S.C. §1681s-2(b)(1)(B) by failing to review all relevant information provided by the consumer reporting agency pursuant to §1681i.

84.    Defendants negligently violated 15 U.S.C. §1681s-2(b) by failing to conduct an investigation as to the accuracy of the information reported by the Defendants to the consumer reporting agencies.

85.    Defendants negligently violated 15 U.S.C. §1681s-2(b)(1)(C) by reporting inaccurate, incomplete, false, and misleading results of the investigation, if any, to the consumer reporting agencies.

86.    Defendants negligently violated 15 U.S.C. §1681s-2(b)(1)(D) by failing to notify

all consumer reporting agencies that the reporting of the accounts the subject of this action was inaccurate, incomplete, false, and misleading.

87. As a result of Defendants' violations set forth above, the Plaintiff suffered, continues to suffer, and will suffer future damages, including, but not limited to, damage to Plaintiff's credit score and credit reputation, severe anxiety, worry, inability to focus, constant racing thoughts, feeling a loss of control of her life, fear, loss of sleep, headaches, irritability, loss of enjoyment of life, physical pain and sickness, frustration, humiliation, embarrassment and mental anguish.

88. Plaintiff is entitled to actual damages in an amount to be determined by the jury.

89. In addition, the Plaintiff has incurred litigation expenses and attorneys' fees which, but for the acts and omissions of Defendants alleged herein, would not have been necessary.

90. Plaintiff is entitled to her attorneys' fees, pursuant to 15 U.S.C. §1681n(a).

## COUNT TWO
**(Fair Credit Reporting Act)**

91. The Plaintiff adopts the averments and allegations of paragraphs 18 through 90 hereinbefore as if fully set forth herein.

92. Defendants willfully violated 15 U.S.C. §1681s-2(b)(1)(A) by failing to conduct an investigation after receiving notice that the Plaintiff disputed the Account information Defendants had provided to a consumer reporting agency.

93. Defendants willfully violated 15 U.S.C. §1681s-2(b)(1)(B) by failing to review all relevant information provided by the consumer reporting agency pursuant to §1681i.

94. Defendants willfully violated 15 U.S.C. §1681s-2(b) by failing to conduct an

20

investigation as to the accuracy of the information reported by Defendants to a consumer reporting agency.

95.     Defendants willfully violated 15 U.S.C. §1681s-2(b)(1)(C) by reporting inaccurate, incomplete, false, and misleading results of the investigation, if any, to the consumer reporting agency.

96.     Defendants willfully violated 15 U.S.C. §1681s-2(b)(1)(D) by failing to notify all consumer reporting agencies that the reporting of the account the subject of this action was inaccurate, incomplete, false, and misleading.

97.     As a result of Defendants' violations set forth above, the Plaintiff suffered, continues to suffer, and will suffer future damages, including, but not limited to, damage to Plaintiff's credit score and credit reputation, severe anxiety, worry, inability to focus, constant racing thoughts, feeling a loss of control of her life, fear, loss of sleep, headaches, irritability, loss of enjoyment of life, physical pain and sickness, frustration, humiliation, embarrassment and mental anguish. Plaintiff is entitled to actual and/or statutory damages in an amount to be determined by the jury.

98.     Due to Defendants' willful violations of the FCRA, Plaintiff is entitled to punitive damages in an amount to be determined by the jury.

99.     In addition, the Plaintiff has incurred litigation expenses and attorneys' fees which, but for the acts and omissions of Defendants alleged herein, would not have been necessary.

100.     Plaintiff is entitled to her attorneys' fees, pursuant to 15 U.S.C. §1681n(a).

## <u>COUNT THREE</u>
### (Violation of the Fair Debt Collection Practices Act)

101.   Plaintiff hereby adopts all of the allegations set forth in paragraphs 18 through 100 as if set forth fully herein.

102.   Within the one year prior to the filing of this lawsuit, Defendant NCA has engaged in collection activities and practices in violation of the Fair Debt Collection Practices Act with respect to the Plaintiff and an alleged consumer debt.

103.   Defendant NCA is a debt collector as that term is defined in 15 U.S.C. 1692a(6) and is regularly engaged in the collection of debts.

104.   Defendant NCA communicated to a person credit information which was known, or which should have been known to be false in violation of §1692e(8).

105.   As a proximate result of Defendant NCA's actions, the Plaintiff suffered, continues to suffer, and will suffer future damages, including, but not limited to, damage to Plaintiff's credit score and credit reputation, severe anxiety, worry, inability to focus, constant racing thoughts, feeling a loss of control of her life, fear, loss of sleep, headaches, irritability, loss of enjoyment of life, physical pain and sickness, frustration, humiliation, embarrassment and mental anguish. Plaintiff is entitled to actual damages in an amount to be determined by the jury.

106.   Plaintiff is also entitled to statutory damages in an amount up to One Thousand Dollars ($1,000) per violation.

107.   In addition, the Plaintiff has incurred litigation expenses and attorneys' fees which, but for the acts and omissions of Defendant alleged herein, would not have been necessary.

108.    Plaintiff is entitled to her attorneys' fees, pursuant to 15 U.S.C. §1681n(a).

## COUNT FOUR
### (Defamation, Libel and Slander)

109.    The Plaintiff adopts the averments and allegations of paragraphs 18 through 108 hereinbefore as if fully set forth herein.

110.    Defendants willfully, wantonly, recklessly and/or maliciously published and communicated false and defamatory statements regarding Plaintiff to third parties and the public at large.  Said statements harmed Plaintiff's reputation and caused Plaintiff physical sickness, mental anguish and emotional distress.

111.    Said communications were false in that Plaintiff was not indebted to Defendants. Plaintiff did not owe any balance on the Accounts the subject of this action as it was the result of a fraudulent account opened in Plaintiff's name without his knowledge or permission.

112.    Said false and defamatory statements have harmed the reputation of Plaintiff and/or deterred third persons from associating with Plaintiff.  Specifically, Defendants undertook to collect the Accounts and reported said Accounts as derogatory accounts on Plaintiff's credit files.  Plaintiff's credit files were viewed by numerous third parties.

113.    Defendants communicated to third parties and the public at large false information concerning Plaintiff, disseminating and imputing false and misleading credit worthiness information concerning Plaintiff, including but not limited to reporting that Plaintiff owed the Accounts the subject of this action.

114.    At the time said communications were made, Defendants knew or should have

23

known the falsity of the communications or recklessly disregarded the potential inaccuracy of the information, yet knowingly, willfully and maliciously communicated the falsity.

115.    As a result of the intentional communications to the third parties of the false information, Plaintiff was caused to suffer injury to her reputation in the eyes of her community and the public at large and was forced to endure credit reporting of the Accounts the subject of this action, in spite of the fact that Plaintiff did not owe the Accounts as same were fraudulently opened in her name.

116.    As a proximate consequence of said defamation, libel and slander, Plaintiff was caused to endure collection activities by Defendant NCA, to have negative credit reports, to be held up to public ridicule or shame, and made to suffer severe anxiety, worry, inability to focus, constant racing thoughts, feeling a loss of control of her life, fear, loss of sleep, headaches, irritability, loss of enjoyment of life, physical pain and sickness, frustration, humiliation, embarrassment and mental anguish, for which she claims compensatory and punitive damages.

## AMOUNT OF DAMAGES DEMANDED

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands a judgment against Defendants for the following:

A.      Actual and statutory damages from Defendants pursuant to 15 U.S.C. §1681n(a)(1)(A) and/or 15 U.S.C. §1681o(a)(1).

B.      Punitive damages from Defendants pursuant to 15 U.S.C. §1681n(a)(2);

C.      Costs and reasonable attorney's fees from Defendants pursuant to 15 U.S.C. §1681n(a)(3);

D.      For relief in amounts or other appropriate relief as may be determined by the Court pursuant to 15 U.S.C. §1692 to include the Plaintiff's actual damages, statutory damages of one thousand ($1,000.00) dollars for Plaintiff, as well as attorney's fees and costs from Defendant NCA;

E.      For compensatory and punitive damages in an amount to be determined by a struck jury for Defendants' defamation, libel and slander of Plaintiff;

F.      For this matter to be heard by a jury; and

G.      For such other and further relief as this Court deems necessary and proper.

/s/ *Penny Hays Cauley*
Penny Hays Cauley, Fed.  ID No.  10323
**HAYS CAULEY, P.C.**
1303 West Evans Street
Florence, SC 29501
(843) 665-1717
phc917@hayscauley.com


**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY ON ALL COUNTS**

/s/ *Penny Hays Cauley*
Of Counsel

**DEFENDANT TO BE SERVED VIA PROCESS SERVER:**

Attain Finance
c/o Doug Clark – Chief Executive Officer
3527 North Ridge Road
Wichita, Kansas 67205

**DEFENDANTS TO BE SERVED VIA CERTIFIED MAIL:**
Heights Finance Holding Co.
c/o Corporation Service Company – Registered Agent
100 Coastal Drive, Suite 210
Charleston, South Carolina 29492

Quick Credit Corporation
c/o Corporation Service Company – Registered Agent
100 Coastal Drive, Suite 210
Charleston, South Carolina 29492

National Credit Adjusters, L.L.C.
c/o Corporation Service Company  – Registered Agent
100 Coastal Drive, Suite 210
Charleston, South Carolina 29492